[No. D034838. Fourth Dist., Div. One. Nov. 21, 2001.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL DELANO ADAMS et al., Defendants and Appellants.

**[Opinion certified for partial publication.[1]]**

---

[1]Pursuant to California Rules of Court, rule 976.1, this opinion is certified for publication with the exception of Discussion parts B and C.

## Counsel

Gary Nelson, under appointment by the Court of Appeal, for Defendant and Appellant Michael Delano Adams.

Laurance S. Smith, under appointment by the Court of Appeal, for Defendant and Appellant Byron Jae Peterson.

Bill Lockyer, Attorney General, David P. Druliner, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Laura W. Halgren, Craig S. Nelson and Alana Cohen Butler, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BENKE, J.**—In a joint trial defendant Michael Delano Adams was found guilty of murder in the second degree and defendant Byron Jae Peterson was found guilty of involuntary manslaughter. In addition it was found true both men proximately caused the death of a senior citizen within the meaning of Penal Code[2] section 368, subdivision (b)(3)(A). Both were sentenced to prison. Adams and Peterson appeal, arguing the evidence was insufficient to support a true finding on the killing of an elderly person allegation, the trial court erred in failing to instruct in the terms of CALJIC No. 17.01 that unanimous jury agreement was required concerning the act resulting in death, and the trial court erred in denying Adams's *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]).

FACTS

### A. *Prosecution Case*

On January 18, 1999, Robert Stratton and Adams went to the Chee Chee Club, where Byron Peterson introduced himself to the men and joined them for cocktails. The men were overheard talking about having sex. Later, the three left the bar and drove together in Stratton's recreational vehicle (RV) to a liquor store.

Sometime later, Richard Cowan, an acquaintance of Adams, saw Adams and Peterson standing next to Stratton's RV. Cowan offered Adams $10 to drive him to a check-cashing establishment. Adams agreed but adamantly refused to take Cowan's friend Joe. On entering the vehicle, Cowan noticed Stratton's body on the floor. Adams and Peterson told Cowan that Stratton had passed out. Peterson then dragged Stratton to the back of the RV.

When the check-cashing establishment refused to cash Cowan's check, the men drove the RV to an apartment complex. Adams removed a television and VCR (videocassette recorder) from the vehicle and sold them at the complex. Adams was nervous during the sale.

While Adams was selling the electronic equipment, Cowan walked to the back of the RV to use the toilet. As he walked through the RV, he tripped

---

[2]All further statutory references are to the Penal Code unless otherwise specified.

over Stratton. Cowan noticed Stratton's hands were tied behind his back with a belt and that he was dead. When Adams returned, Cowan asked him what was "up." Adams and Peterson suggested the men keep the matter to themselves. Cowan stated he was leaving, got out of the RV and called the police.

When officers responded, Adams and Peterson were still in the vehicle. The police ordered them out, entered the RV and found Stratton's body. The officers noted Adams had a three-inch long red scrape on his forearm and a scratch on his back.

Stratton died from blunt-force trauma and asphyxia due to strangulation. At the time of his death Stratton was 69 years old.

B. *Adams's Defense*

Adams testified he and Stratton introduced themselves to Peterson at the Chee Chee Club. Stratton was "smitten" with Peterson. After the men used cocaine in the RV they decided to purchase more cocaine and then go to Sunset Cliffs. Before doing so Stratton used more cocaine and became paranoid. Adams told him everything was alright. When Stratton tripped trying to leave the vehicle, Adams and Peterson pulled him back in. With Stratton's consent Adams took the keys and started to drive. Peterson straddled Stratton and the two fondled each other and kissed for a few seconds. Adams drove to a nearby liquor store. Leaving Stratton and Peterson in the vehicle, Adams went into the store, purchased liquor and then returned. Adams stated Stratton was alive when the men drove away from the store.

As Adams drove to a second location to buy drugs, Stratton and Peterson remained seated on the floor of the RV. Adams heard movement, sounds and conversation but did not know if what began as sex play had become violent. Adams testified he did not see Peterson hitting Stratton. When Adams stopped to buy drugs, Stratton was snoring and appeared to be alright.

As Adams left the vehicle, he ran into his friend Cowan. Adams and Cowan purchased drugs, then returned to the RV. Stratton was on the floor asleep and snoring.

Adams then drove the RV to a check-cashing establishment. During the drive Cowan moved from the front of the vehicle to the rear. When they stopped, Cowan returned to the front and he and Adams went into the check-cashing establishment. After 15 to 20 minutes the two men returned to

the vehicle. Peterson was talking to a third man, Freddie. Freddie got into the vehicle and the men drove to an apartment nearby to buy drugs. Adams removed a VCR from the RV to exchange it for drugs. Freddie and Adams took the VCR to an apartment. Adams then returned to the RV to get a television and the cable to connect the VCR to it. Peterson and Cowan were standing over Stratton. Cowan told Adams that Stratton was dead. Adams asked Cowan what was happening. Cowan stated he did not know and that he was leaving. Cowan left. Peterson suggested they rub their fingerprints off of everything in the RV. A few moments later the police arrived.

Adams denied doing anything that would have caused Stratton's death. Adams conceded on cross-examination that he had told a variety of inconsistent stories concerning what happened the night of Stratton's death. In some of those stories Adams stated that Peterson threw Stratton to the ground and beat him.

### C. *Peterson's Defense*

Peterson testified he went to the Chee Chee Club, became drunk and met Adams and Stratton. Peterson testified he was not gay and did nothing that evening to lead the men to believe he was interested in having sex with them. Eventually, the three men began driving about in Stratton's RV. During the evening Adams and Stratton argued repeatedly. After the men left a liquor store, the argument became physical and Stratton slapped Adams numerous times in the face. Stratton tried to leave the vehicle but Adams pulled him back inside. Adams knocked Stratton to the floor. He held Stratton's hands together and told Peterson to help him. Peterson wrapped a belt around Stratton's hands. As Peterson walked to the front of the RV, he kicked Stratton once in the chest and once in the leg. Peterson stated Stratton was still alive when he bound his wrists. Stratton got off the floor and continued to fight but was unable to hit Adams because his hands were bound. Peterson stated Adams strangled Stratton for two to three minutes. After Adams threw him against a wall, Stratton ceased resisting and fell to the floor. Peterson believed Stratton was merely knocked out.

Peterson confirmed the general chronology of events described by Cowan and Adams. Peterson stated he only discovered Stratton was dead when Cowan announced that fact later in the evening.

Jail inmate Jason Pollock testified that while he was in a holding cell with Peterson, Adams attempted to intimidate Peterson into taking responsibility for the crime. Adams admitted he argued with Stratton over money, drugs and jealousy and grabbed Stratton by the neck and choked him.

## DISCUSSION

### A. *Elder Abuse Enhancement*

Appellants were charged with murder. As to that charge, it was alleged within the meaning of section 368, subdivision (b)(3)(A), that the victim was elderly and appellants caused his death. Adams was convicted of second degree murder and Peterson was convicted of involuntary manslaughter. The section 368, subdivision (b)(3)(A), allegation was found true as to both appellants. Adams was sentenced to an indeterminate term of 15 years to life plus 5 years for the section 368, subdivision (b)(3)(A), enhancement. Peterson was sentenced to the midterm of three years on the involuntary manslaughter conviction plus five years for the enhancement.

Appellants argued the evidence was insufficient to support a true finding on the enhancement. ■ We asked the parties to brief the more fundamental question of whether a section 368, subdivision (b)(3)(A), enhancement is applicable to a charge of murder or manslaughter or is applicable only to the crime of elder abuse as defined in section 368, subdivision (b)(1). We conclude the enhancement is applicable only to the latter offense.[3]

### 1. *Rules of Interpretation*

■ The task in determining the proper application of the section 368, subdivision (b)(3)(A), enhancement is to ascertain the intent of the Legislature in creating it. (*People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) We consider first the statute's words because they are generally the most reliable indicator of legislative intent. If they are clear and unambiguous and not reasonably susceptible of more than one meaning, there is no need for construction and we simply apply the words as written. (*Ibid.*)

■ When some ambiguity exists in the words of the statute, both legislative history and the " 'wider historical circumstances' " of the enactment may be considered in determining the Legislature's intent. (*People v. Cruz* (1996) 13 Cal.4th 764, 782-783 [55 Cal.Rptr.2d 117, 919 P.2d 731].) Legislative committee reports, bill reports and other legislative records are appropriate sources from which that intent may be ascertained. (*Calvillo-Silva v. Home Grocery* (1998) 19 Cal.4th 714, 724 [80 Cal.Rptr.2d 506, 968 P.2d 65].)

---

[3]There is no impediment to the People charging both murder pursuant to section 187 and the separate offense of elder abuse pursuant to section 368 with its applicable enhancement.

### 2. *The Language of Section 368, Subdivision (b)*

Section 368, subdivision (b)(1), creates an expansive crime that punishes the abuse of elder or dependent adults. The defined punishable abuse is of several types and can be committed in a variety of ways.[4]

Section 368, subdivision (b)(3)(A), in relevant part states: "(3) If *in the commission of an offense described in paragraph (1)*, the defendant proximately causes the death of the victim, the defendant shall receive an additional term in the state prison as follows:

"(A) Five years if the victim is under 70 years of age." (Italics added.)[5]

 We conclude the language of section 368, subdivision (b)(3)(A), unambiguously states that the enhancement applies only to a conviction of the crime described in section 368, subdivision (b)(1). Section 368, subdivision (b)(3)(A)'s use of the phrase "If in the commission of an offense described in paragraph (1)" makes a direct reference to the crime created in that subdivision (b)(1) and evidences no intent to apply the enhancement to any other crime.

It is also meaningful that the crime created by section 368, subdivision (b)(1), and the enhancements created by subdivision (b)(3)(A) and (B), are all subsumed in the same subdivision. The reasonable interpretation of such a construction is that the crime and the enhancements are meant to be interlocking. The enhancements are not freestanding and have no application except to the crime created in subdivision (b)(1).

---

[4]Section 368, subdivision (b)(1), states: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any elder or dependent adult, with knowledge that he or she is an elder or a dependent adult, to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any elder or dependent adult, willfully causes or permits the person or health of the elder or dependent adult to be injured, or willfully causes or permits the elder or dependent adult to be placed in a situation in which his or her person or health is endangered, is punishable by imprisonment in a county jail not exceeding one year, or by a fine not to exceed six thousand dollars ($6,000), or by both that fine and imprisonment, or in the state prison for two, three, or four years."

[5]Section 368, subdivision (b)(2) and (3), states: "(2) If in the commission of an offense described in paragraph (1), the victim suffers great bodily injury, as defined in subdivision (e) of Section 12022.7, the defendant shall receive an additional term in the state prison as follows:
"(A) Three years if the victim is under 70 years of age.
"(B) Five years if the victim is 70 years of age or older.
"(3) If in the commission of an offense described in paragraph (1), the defendant proximately causes the death of the victim, the defendant shall receive an additional term in the state prison as follows:
"(A) Five years if the victim is under 70 years of age.
"(B) Seven years if the victim is 70 years of age or older."

### 3. *Legislative History of Section 368, Subdivision (b)(3)(A)*

Even if ambiguity existed in the language of section 368, subdivision (b)(3)(A), we would still conclude based on legislative history that the enhancement was intended to apply only to the crime described in subdivision (b)(1).

In 1997 section 368 contained the core elder abuse crime now described in subdivision (b)(1) but not the enhancements defined in subdivision (b)(2) and (3). In 1997, Senate Bill No. 1238 as introduced created a new crime for any caretaker of an elderly or dependent adult, under circumstances or conditions likely to produce great bodily injury or death, to willfully cause or permit such person to suffer, or to inflict thereon unjustified physical pain or mental suffering, or to willfully cause or permit the person or health of that person to be injured or endangered, resulting in the death of that person. The crime was punishable by a prison term of 15 years to life. (Sen. Bill No. 1238 (1997-1998 Reg. Sess.) as introduced Feb. 28, 1997.)

The Colusa County District Attorney sponsored the bill. That prosecutor had recently charged a married couple with murder based on the death of the wife's mother as the result of alleged neglect. When the jury was unable to reach a verdict, the couple pleaded nolo contendere to charges of elder abuse. The wife was sentenced to the midterm of three years in prison, the husband to a jail term. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1238.)

In sponsoring the bill the district attorney stated that the current maximum term of four years for elder abuse was too short particularly if willful conduct resulted in death. This was so even if a great bodily injury enhancement pursuant to the section 12022.7 was applicable.[6] The district attorney asserted prosecutors were left with the alternative of filing involuntary manslaughter charges which carried the same punishment (§ 193, subd. (b)) as the crime of elder abuse or charging murder, which in most instances would be impossible to prove. (Sen. Com. on Public Safety, Analysis of Sen. Bill No. 1238 (1997-1998 Reg. Sess.).)

The bill was first amended to eliminate the new homicide offense and instead to make applicable to the crime of elder abuse described in section 368, subdivision (a), the various great bodily injury enhancements described

---

[6]Section 12022.7, subdivision (a), in 1997 and now, provides an additional three-year term for any felony in which great bodily injury is personally inflicted by the defendant. Section 12022.7, subdivision (c), provides an additional five-year term for the personal infliction of great bodily injury if the victim is 70 years of age or older. Neither subdivision applies to a conviction for murder or manslaughter. (§ 12022.7, subd. (g) [formerly subd. (f)].)

in section 12022.7, even when the crime committed was murder or manslaughter. (Sen. Bill No. 1238 (1997-1998 Reg. Sess.) as amended May 5, 1997.)

Next, the bill was amended to eliminate the provision concerning the application of the great bodily injury enhancements in section 12022.7, to elder abuse under section 368, subdivision (a). Instead, the bill added paragraph (1) to section 368, subdivision (a), which stated the crime of elder abuse. It then added paragraph (2), which created a five-year enhancement when "in the commission of an offense described in paragraph (1)" a victim 70 years of age or older suffers great bodily injury, and a three-year enhancement for a victim between 65 and 70 years of age. Paragraph (3) was also added creating a seven-year enhancement if a 70-year-old or older victim died in the commission of an offense described in subdivision (a)(1), and five years if the victim was between 65 and 70 years of age. (Assem. Amend. to Sen. Bill No. 1238 (1997-1998 Reg. Sess.) as amended July 9, 1997.)

The amendment also added section (g), which stated: "Nothing in this section shall preclude prosecution under both this section and section 187 or 12022.7 or any other provision of law. However, a person shall not receive an additional term of imprisonment under both paragraphs (2) or (3) of subdivision (a) and Section 12022.7 for any single offense." (Sen. Bill No. 1238 (1997-1998 Reg. Sess.) as amended July 9, 1997.)

The bill was next amended to indicate that to be liable for the enhancement in paragraph (3) it was necessary that the defendant "proximately cause[] the death of the victim." (Sen. Bill No. 1238 (1997-1998 Reg. Sess.) as amended July 21, 1997.)

In a later amendment, subdivision (g) was amended to state: "However, a person shall not receive an additional term of imprisonment under both paragraphs (2) and (3) of subdivision (a) for any single offense, nor shall a person receive an additional term of imprisonment under both section 12022.7 and paragraph (2) or (3) of subdivision (a) for any single offense." (Sen. Bill No. 1238 (1997-1998 Reg. Sess.) as amended Sept. 5, 1997.) In that form the bill became law.

We find nothing in the history of Senate Bill No. 1238 indicating an intention by the Legislature to create a general enhancement applicable to any crime committed against an elderly person. Such general enhancements, albeit in a different form, already existed in section 12022.7. Had the Legislature intended to expand that general enhancement, the most logical course would have been to amend section 12022.7.

We also note that in the Legislative Counsel's Digest and in various committee reports concerning the bill, the crime in section 368, subdivision

(b)(1) is first described and is then followed invariably by a statement that the bill further "provide[s] that if in the commission of the *above crime*, the victim suffers great bodily injury" (Legis. Counsel's Dig., Sen. Bill No. 1238 (1997-1998 Reg. Sess.), italics added), additional terms of imprisonment are imposed. We take this as an indication that the enhancements described in section 368, subdivision (b)(2) and (3), were intended to apply only to the crime described in section 368, subdivision (b)(1).

The section 368, subdivision (b)(3)(A), is ordered stricken from the abstract of judgment of both appellants.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The section 368, subdivision (b)(3)(A), enhancements as to each appellant are stricken. In all other respects the judgments are affirmed.

Kremer, P. J., and Huffman, J., concurred.

A petition for a rehearing was denied December 14, 2001, and appellants' petition for review by the Supreme Court was denied February 20, 2002.

---

*See footnote 1, *ante,* page 1192.