Filed 3/3/23  P. v. Adams CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br> Plaintiff and Respondent,<br><br>v.<br><br>MICHAEL DELANO ADAMS,<br><br> Defendant and Appellant. | D079158<br><br><br>(Super. Ct. No. SCD142346) |

APPEAL from an order of the Superior Court of San Diego County, Jay M. Bloom, Judge.  Affirmed.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Robin Urbanski, Alan L. Amann, and Juliet W. Park, Deputy Attorneys General, for Plaintiff and Respondent.

After a night of partying that included the consumption of alcohol and cocaine, Earl Robert Stratton died in an RV by asphyxiation and blunt force trauma. Michael Delano Adams and Byron Jae Peterson were with Stratton in the RV, and the People jointly charged them with and tried them for his murder. Instructed on several different theories, the jury acquitted Adams of first degree murder but convicted him of murder in the second degree. (Pen. Code,[1] § 187, subd. (a).) It acquitted Peterson of first and second degree murder but convicted him of involuntary manslaughter. (§ 192, subd. (b).)

Twenty years later, Adams filed a resentencing petition under section 1172.6 based on recent changes to murder liability in California. (Stats. 2018, ch. 1015, §§ 2−3 (Sen. Bill No. 1437); Stats. 2021, ch. 551, § 2 (Sen. Bill No. 775).) The trial court summarily denied his petition without issuing an order to show cause, and Adams appealed. As we explain, the trial court properly found that the record of conviction refuted the factual allegations accompanying his petition. Adams was not convicted of felony murder or murder under the natural and probable consequences doctrine. To the extent Senate Bill No. 775 expands the scope of resentencing relief to some other category of defendants as to whom malice could have been imputed, the record of conviction conclusively refutes the possibility of such imputation where Peterson was convicted of involuntary manslaughter. Concluding Adams cannot make a prima facie case of eligibility for resentencing relief under section 1172.6, we affirm the summary denial of his petition.

---

[1] Further undesignated statutory references are to the Penal Code.

2

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Factual background*

We described the facts in greater detail in addressing Adams's direct appeal.  (*People v. Adams* (2001) 93 Cal.App.4th 1192 (*Adams I*).)  Here we are concerned with the summary denial of his section 1172.6 petition and summarize the facts solely as needed to construe the jury's verdicts.

Adams and Stratton were previously acquainted.  On January 18, 1999, the two spent the day together consuming alcohol and cocaine.  They went to a nightclub, met Peterson, left the club, and continued partying in Stratton's motor home (RV).  At some point a scuffle ensued, and Stratton died by asphyxiation due to strangulation and multiple blunt force trauma.  Sometime later, Adams offered his friend a ride in the RV.  The friend discovered Stratton's body in the motor home and called police.  Adams and Peterson were still in the RV when police arrived.  (*Adams I, supra,* 93 Cal.App.4th at p. 1195.)

There were abrasions on Stratton's neck characteristic of fingernail marks.  Fingernail scrapings were processed from both Adams and Peterson.  Adams's scrapings suggested a mixture of DNA from two or more people, whereas Adams's and Stratton's DNA could be excluded from Peterson's fingernail scrapings.  Adams had scratches on his back and forearm that were photographed by police.

The San Diego County District Attorney charged Adams and Peterson with Stratton's murder.  Adams testified in his defense at trial and denied any physical struggle.  (See generally, *Adams I, supra,* 93 Cal.App.4th at pp. 1195–1196.)  He recalled that as the trio left the nightclub to party and buy more drugs, Stratton took a hit of cocaine and grew paranoid, saying he no longer wanted to go.  Stratton tried to exit the RV but tripped, and Adams

3

pulled him back inside. Peterson then straddled Stratton and began fondling him. With permission, Adams took the keys from Stratton's pocket and drove to a nearby liquor store. There was no other physical contact or struggle that he could see, although the RV had no rearview mirror. Adams conceded on cross-examination his testimony diverged from his statements to police, including his account that he saw Peterson beat Stratton.

Peterson also testified at trial but offered a different account. (See generally, *Adams I, supra,* 93 Cal.App.4th at p. 1196.) As he told it, the trio left the nightclub in the RV, and Stratton and Adams got into an argument that eventually became physical. Stratton started slapping Adams in the face and tried to leave the RV, but Adams pulled him back in. Peterson helped Adams bind Stratton's hands with a belt. Stratton got up and tried to fight with his hands bound. Adams then grabbed Stratton's throat with one hand and punched him with the other. He strangled Stratton in that standing position for two or three minutes, and Stratton could not fight back. When the pair toppled over Peterson, Peterson stood up, causing Stratton to hit the wall and fall to the ground with a grunt. Peterson then kicked Stratton twice, once in the chest and once in the leg. At this point he believed Stratton was merely knocked out—he had a pulse after the fall.

A person placed in the same holding cell as Adams and Peterson testified in Peterson's defense that Adams admitted strangling Stratton and tried to make Peterson take the fall.

Instructing the jury, the court defined general concepts like principals and aiding and abetting. (CALJIC Nos. 3.00, 3.01) It then provided instructions on four theories of murder: (1) first degree premeditated murder (CALJIC 8.20); (2) first degree felony murder in the commission of a carjacking or kidnapping (CALJIC Nos. 8.21, 8.27); (3) second degree

4

intentional murder without premeditation (CALJIC No. 8.30); and (4) second degree implied malice murder (CALJIC No. 8.31). Further instructions were provided on manslaughter, unanimity, how to conduct deliberations, and how to fill out verdict forms. (CALJIC Nos. 8.74, 8.75, 17.40.)

The jury acquitted Adams of first degree murder and found the special circumstance allegations of kidnapping-murder and carjacking-murder under section 190.2, subdivision (a) "not true." It convicted Adams of second degree murder. By contrast, the jury deemed Peterson less culpable, acquitting him of second degree murder and convicting him instead of involuntary manslaughter (§ 192, subd. (b)). Elder abuse enhancements were found true as to both defendants but stricken on direct appeal. (*Adams I, supra,* 93 Cal.App.4th at p. 1201.) Adams was sentenced to serve 15 years to life in state prison.

B.    *Section 1172.6 petition*

Twenty years passed. In June 2019, Adams filed a petition to vacate his murder conviction and seek resentencing pursuant to section 1172.6.[2] A form declaration asserted that he "could not be convicted of this count of murder because of the changes made to Penal Code section 188 or 189, made effective January 1, 2019." The matter was stayed pending proceedings challenging the constitutionality of Senate Bill No. 1437. Once the stay was lifted, the People filed a responsive brief stating Adams was not convicted of first degree felony murder, was likely found to be the actual killer, and direct

---

[2]    At the time Adams filed his petition, he brought it under former section 1170.95. Effective June 30, 2022, section 1170.95 was renumbered section 1172.6 without any change in text. (Stats. 2022, ch. 58, § 10 (Assem. Bill No. 200).) For the sake of clarity, we will refer to the statute by its current enumeration.

aiding and abetting liability for malice murder remained unchanged. On reply, Adams noted the low burden required to make a prima facie showing under section 1172.6. At the parties' joint request, the court admitted the underlying trial record.

The court requested supplemental letter briefs asking whether section 1172.6 applied where the jury acquitted Adams of first degree felony murder and was not instructed on second degree felony murder (CALJIC No. 8.32). The parties submitted their respective briefs. Hearing arguments from the parties, the court took the petition under submission. It issued an order on June 7, 2021, summarily denying relief and reasoning in relevant part:

> "The jury returned a verdict of not guilty of first degree murder and found the first degree [special circumstance] felony murder allegation to be not true. The jury did convict petitioner of second degree murder. . . . However, as noted, they were not instructed on second degree felony murder, or natural and probable consequences and target crimes. They were only instructed on malice. Thus, the felony murder rule or the natural and probable consequences theory did not affect the verdict in this case."

## DISCUSSION

Adams challenges the summary denial of his section 1172.6 petition. To understand his somewhat confusing arguments, we must summarize the changes to murder liability under Senate Bill Nos. 1437 and 775. For reasons we explain, the record of conviction conclusively shows that Adams was not convicted of felony murder, murder under the natural and probable consequences doctrine, or any other ostensible theory in which malice was imputed based solely on his participation in a crime. Consequently, he cannot make a prima facie case of eligibility for relief, and the trial court properly denied his petition without issuing an order to show cause.

6

A.    *Senate Bill Nos. 1437 and 775 amend felony murder and murder under the natural and probable consequences doctrine.*

Murder is an unlawful killing with malice aforethought.  (§ 187.) Malice may be express or implied.  (§ 188, subd. (a).)  It is express "when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature," and implied "when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart."  (§ 188, subd. (a)(1)−(a)(2).)  Case law has long defined implied malice as a killing " 'proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " [Citation.]  In short, implied malice requires a defendant's awareness of engaging in conduct that endangers the life of another . . . .' " (*People v. Cravens* (2012) 53 Cal.4th 500, 507.)

Before Senate Bill No. 1437, the felony murder rule and natural and probable consequences doctrine provided exceptions to the malice requirement for murder.  The felony murder rule made "a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state."  (*People v. Chun* (2009) 45 Cal.4th 1172, 1182 (*Chun*).)  The natural and probable consequences doctrine imposed liability on aiders and abettors not only for the intended offense (or target crime), but also for any other offense (or nontarget crime) that was committed as a natural and probable consequence of the crime originally aided and abetted.  (*People v. Prettyman* (1996) 14 Cal.4th 248, 254 (*Prettyman*).)  Because a nontarget crime " 'is unintended, the mens rea of the aider and abettor with respect to that offense is irrelevant and culpability is imposed simply because a reasonable person could have foreseen the

7

commission of the [murder].'" (*People v. Chiu* (2014) 59 Cal.4th 155, 164 (*Chiu*); see *People v. McCoy* (2001) 25 Cal.4th 1111, 1117 (*McCoy*) [someone who aided and abetting an assault could be liable for a resulting murder, even if the killing was unintended, where it was a natural and probable consequence of the intended assault].)

The Legislature enacted Senate Bill No. 1437 in 2018 "after determining that there was further 'need for statutory changes to more equitably sentence offenders in accordance with their involvement in homicides.'" (*People v. Gentile* (2020) 10 Cal.5th 830, 838–839 (*Gentile*), citing Stats. 2018, ch. 1015, § 1, subd. (b).) The bill added three separate provisions to the Penal Code to largely remove the exceptions to first and second degree murder that had allowed such convictions despite a lack of malice.

To amend the felony murder rule, Senate Bill No. 1437 added section 189, subdivision (e) to provide that felony murder liability only applies to a person who (1) was the actual killer, (2) was not the actual killer but, with intent to kill, aided and abetted the actual killer in committing murder, or (3) was a major participant in the underlying felony who acted with reckless indifference to human life. (§ 189, subd. (e); see *Gentile, supra,* 10 Cal.5th at p. 842.)

To amend the natural and probable consequences doctrine, Senate Bill No. 1437 added section 188, subdivision (a)(3), which provides that outside of what felony murder liability remains in section 189, subdivision (e), "in order to be convicted of murder, a principal in a crime shall act with malice aforethought. Malice shall not be imputed to a person based solely on his or

8

her participation in a crime." (§ 188, subd. (a)(3); see *Gentile, supra,* 10 Cal.5th at pp. 842–843.)[3]

Finally, Senate Bill No. 1437 added a procedure now codified at section 1172.6 to enable those convicted of murder under theories of felony murder or the natural and probable consequences doctrine to have their murder convictions vacated and be resentenced on any remaining counts. (§ 1172.6, subd. (a); see *Gentile, supra,* 10 Cal.5th at p. 843.) A defendant seeking relief must file a petition supported by a declaration that the petitioner meets all eligibility requirements, including that he or she could not presently be convicted because of changes to sections 188 or 189. (§ 1172.6, subds. (a)(3), (b)(1)(A); see *People v. Strong* (2022) 13 Cal.5th 698, 708 (*Strong*).)

On receipt of a section 1172.6 petition, the trial court must "determine whether the petitioner has made a prima facie case for relief." (§ 1172.6, subd. (c); *Strong, supra,* 13 Cal.5th at p. 708.) A petition may be summarily denied without an evidentiary hearing if the petition and the record of conviction "establish conclusively that the defendant is ineligible for relief." (*Strong,* at p. 708.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' [Citation.] As the People emphasize, the 'prima facie bar was intentionally and correctly set very low.'" (*People v. Lewis* (2021) 11 Cal.5th 952, 972 (*Lewis*).) A court may

---

[3] In 2014, the California Supreme Court held that the natural and probable consequences doctrine could not support a conviction for first degree murder but would support second degree murder liability. (*Chiu, supra,* 59 Cal.4th at p. 166.) As discussed *post*, Senate Bill No. 1437 eliminated murder liability altogether under the natural and probable consequences theory. (*Gentile, supra,* 10 Cal.5th at p. 846.)

reject a petitioner's declared factual allegations only if the record *refutes* them. (*Id.* at p. 971)

While this appeal was pending, the Legislature enacted Senate Bill No. 775 to broaden the pool of eligible petitioners to include those charged and/or convicted of attempted murder or manslaughter under a theory of felony murder or the natural and probable consequences doctrine. (Stats. 2021, ch. 551, § 1, subd. (a).) The amendment "ostensibly" further broadened eligibility for those convicted of murder. (*People v. Vizcarra* (2022) 84 Cal.App.5th 377, 388 (*Vizcarra*).) Before, the statute permitted a petition to be filed by "[a] person convicted of felony murder or murder under a natural and probable consequences theory." (Stats. 2018, ch. 1015, § 4 (former section 1170.95, subd. (a)).) Effective January 1, 2022, a petition may also be filed by a person convicted of murder under any "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a); Stats. 2021, ch. 551, § 2.)[4]

---

[4]     As introduced, Senate Bill No. 775 applied only to "[a] person convicted of felony murder or murder under a natural and probable consequences doctrine, attempted murder under the natural and probable consequences doctrine, or manslaughter." (See Legis. Counsel's Dig., Sen. Bill No. 775 (2021−2022 Reg. Sess.) as introduced Feb. 19, 2021.) On the recommendation of authoring Senator Josh Becker, the bill was amended in the Senate to reflect the current wording of section 1172.6, subdivision (a). (See Legis. Counsel's Dig.*,* Sen. Bill No. 775, *supra,* as amended May 20, 2021.) Legislative history does not shed light on the reasoning behind adding the "other theory under which malice is imputed" language to section 1172.6, subdivision (a).

B.    *The record of conviction conclusively proves that Adams cannot make a prima facie showing under section 1172.6.*

We must determine whether Adams makes a prima facie case that he "could not presently be convicted of murder . . . because of changes to Section 188 or 189 made effective January 1, 2019." (§ 1172.6, subd. (a)(3).)  Looking to the record of conviction without engaging in factfinding (*Lewis, supra,* 11 Cal.5th at p. 972), we conclude Adams is not entitled to resentencing relief because his conviction was not based on any now-prohibited theory.

   1.    *Adams was not convicted of felony murder.*

Although the jury was instructed on first degree felony murder, it *acquitted* Adams of this charge, finding allegations that he engaged in kidnapping-murder or carjacking-murder untrue.  Changes to section 189, subdivision (e) thus do not affect his conviction, at least not directly.[5]

Adams suggests the jury may have been misled by CALJIC No. 8.71 to convict him of second degree murder by compromise vote, with some jurors convinced instead of felony murder liability.  (See *People v. Moore* (2011) 51 Cal.4th 386, 411 [CALJIC Nos. 8.71 and 8.72 "carry at least some potential for confusing jurors about the role of their individual judgments in deciding between first and second degree murder, and between murder and manslaughter"].)  But as the People point out, the jury was instructed under CALJIC No. 8.74 to unanimously agree on degree of murder.  CALJIC No. 8.75 explained that the court could not accept a second degree murder conviction "unless the jury also *unanimously* finds and returns a signed verdict form of not guilty as to murder of the first degree." (Italics added.)

---

[5]    We later address Adams's claim that changes to felony murder liability under section 189, subdivision (e) indirectly affect the standard for implied malice murder.

11

Jurors were further instructed under CALJIC No. 17.40 to decide each issue for themselves. These instructions dispelled any potential confusion arising from the use of CALJIC No. 8.71. (*People v. Gunder* (2007) 151 Cal.App.4th 412, 425; *People v. Gomez* (2018) 6 Cal.5th 243, 302−303.) By acquitting Adams of first degree murder and finding the associated special circumstance allegations untrue, the jury unanimously rejected liability under a first degree felony murder theory.

Adams raises a different argument in his reply brief, suggesting he might have been convicted of *second degree felony murder*, despite the jury receiving no such instruction. Adams relies on the jury's true finding on the elder abuse allegation under section 368, subdivision (b)—which was stricken on direct appeal—to suggest that the jury relied on a felony murder theory to convict him.[6]

This claim is untenable. Apart from the lack of instruction, the merger doctrine precludes conviction for second degree felony murder based on an inherently dangerous felony that is assaultive in nature. (*People v. Bryant* (2013) 56 Cal.4th 959, 966.) For these types of assaultive felonies, "a defendant may not be found guilty of murder without proof of malice." (*Ibid.*) Thus, the jury could not have convicted Adams of second degree felony murder predicated on elder abuse "under circumstances likely to produce great bodily harm or death." (§ 368, subd. (b)(1); see *People v. Chun, supra,* 45 Cal.4th at p. 1200 [felony child abuse, which encompasses both child abuse by direct assault and endangerment by extreme neglect, would merge with

---

[6] Section 368, subdivision (b)(1) proscribes inflicting physical pain or mental suffering on an elder "under circumstances likely to produce great bodily harm or death." Subdivision (b)(3) of the same statute provides sentence enhancements of varying lengths based on the victim's age if the elder abuse causes the victim's death.

the underlying homicide]; *People v. Valdez* (2002) 27 Cal.4th 779, 784, fn. 4 [elder abuse statute "was patterned on and is virtually identical to" the child abuse statute; "[c]ases interpreting one section are therefore appropriately used to interpret the other"].)

Because the record of conviction conclusively establishes that the jury could not have relied on a theory of felony murder, changes to the felony murder rule have no bearing on Adams's murder conviction.

2. *Adams was not convicted of murder under the natural and probable consequences doctrine.*

The jury was instructed on two different theories of second degree murder—express malice (CALJIC No. 8.30) and implied malice (CALJIC No. 8.31). It was also instructed that principals to a crime could be a direct perpetrator or an aider and abettor. (CALJIC No. 3.01.) As both parties appear to agree, it is not clear from the jury verdicts who the jury believed was the actual killer.[7] Stratton died by asphyxiation due to strangulation and multiple blunt force trauma. Peterson admitted kicking and inadvertently pushing Stratton, but claimed it was Adams who strangled and beat him. Although the People presented contrary evidence, Adams denied any physical struggle or personal role. The question becomes whether there was a path to convict Adams as an aider and abettor of Stratton's murder under a natural and probable consequences theory. For reasons we explain, there was not.

---

[7]     Assuming for the sake of argument that the jury found Peterson to be the actual killer, that finding would not preclude it from holding Adams liable for a more serious crime as an aider and abettor, provided his mens rea was more culpable. (*McCoy, supra,* 25 Cal.4th at pp. 1119, 1122−1123.)

Generally speaking, "an aider and abettor's liability for criminal conduct is of two kinds.  First, an aider and abettor with the necessary mental state is guilty of the intended crime.  Second, under the natural and probable consequences doctrine, an aider and abettor is guilty not only of the intended crime, but also 'for any other offense that was a "natural and probable consequence" of the crime aided and abetted.' " (*McCoy, supra,* 25 Cal.4th at p. 1117.)  Prior to Senate Bill No. 1437, someone who aided and abetted an assault could be liable for a resulting murder, even if the death of the victim was unintended, "if it is a natural and probable consequence of the intended assault." (*McCoy,* at p. 1117.)

"When a person directly perpetrates a killing, it is the perpetrator who must possess such malice." (*Gentile, supra,* 10 Cal.5th at p. 844.)  The same is true for a person who directly aids and abets a murder. (*Ibid.*; see *McCoy, supra,* 25 Cal.4th at p. 1118 ["outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator"].)  But a different rule applies to a defendant convicted under the natural and probable consequences theory.  "Unlike direct aiding and abetting liability, culpability under the natural and probable consequences theory does not require an accomplice to share the direct perpetrator's intent." (*Gentile,* at p. 844.)  "So long as the direct perpetrator possessed malice, and the killing was a natural and probable consequence of the crime the defendant aided and abetted, it did not matter whether the defendant intended to kill or acted with conscious disregard for human life." (*Id.* at p. 845.)

Senate Bill No. 1437 eliminated the natural and probable consequences theory of murder liability by adding a requirement in section 188, subdivision (a)(3) that a defendant personally possess malice aforethought. (*Gentile,*

14

*supra,* 10 Cal.5th at p. 846.) This change had no effect on direct aiding and abetting liability based on implied malice: "an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Id.* at p. 850; see *Vizcarra, supra,* 84 Cal.App.5th at p. 391 ["[W]e join the chorus of appellate authorities—from the Supreme Court, our own court, and other Courts of Appeal—which have uniformly upheld aiding and abetting implied malice murder as a viable form of murder liability, notwithstanding the legislative changes effectuated by Senate Bill 1437 and Senate Bill 775."]; *People v. Superior Court* (*Valenzuela*) (2021) 73 Cal.App.5th 485, 499 [same].)

Implied malice is not, as Adams suggests, a form of *imputed malice* eliminated by Senate Bill Nos. 1437 and 775. (*Vizcarra, supra,* 84 Cal.App.5th at p. 391.) As one court recently put it, "for liability under the natural and probable consequences doctrine, the aider and abettor need only have the intent to participate in a target offense; guilt for the charged crime is thereby imputed to him. But for second degree murder based on implied malice, there is no imputation of malice because . . . the direct aider and abettor must have the same mental state as the actual perpetrator of the charged crime: the direct aider and abettor must act with knowledge that *the act* is dangerous to human life and with conscious disregard for human life. Given the mens rea requirements for aiding and abetting implied malice, not only is malice not 'imputed' on this direct aiding and abetting theory, but liability is not grounded 'solely' upon participation in the crime within the meaning of section 188, subdivision (a)(3) as amended in Senate Bill 1437. Liability for murder is grounded upon the requirement that the aider and

15

abettor personally harbor malice." (*People v. Glukhoy* (2022) 77 Cal.App.5th 576, 590–591, review granted July 27, 2022, S274792.)

Adams conflates distinct concepts to suggest that the " 'conscious disregard for life' " standard of implied malice does not survive Senate Bill No. 775. The "conscious disregard" language for implied malice murder is linguistically similar but analytically distinct from the now-invalidated natural and probable consequences theory of murder liability. (See *People v. Clements* (2022) 75 Cal.App.5th 276, 298 ["the definition of implied malice remains unchanged"]; *Gentile, supra,* 10 Cal.5th at p. 850 [implied malice murder occurs "if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life"]; see also CALCRIM No. 520 [using "conscious disregard" language to define implied malice].)

Adams further suggests that amendments to section 189, subdivision (e) limiting *first degree felony murder* liability apply to second degree murder. He claims section 189 now limits "imputed malice murder liability to major participants who acted with reckless indifference to the danger of human life" and contends this standard is more rigorous than the "conscious disregard" standard used in "now-outdated implied malice case law." Adams is mistaken on several levels. First, as noted, implied malice is not *imputed* malice and remains a viable theory. Second, by its plain language, section 189, subdivision (e) applies only to someone who participates in "a felony listed in [section 189,] subdivision (a)." Third, Adams fails to appreciate the difference between felony murder and malice murder. Felony murder reflects an exception to the general malice requirement of murder, with certain types of felonious conduct negating the need to ascertain a defendant's mental state. With implied malice murder, malice is *inferred* (not imputed) from defendant's *own* acts and knowledge. That first degree felony murder

16

liability now requires at least "reckless indifference to human life" (§ 189, subd. (e)) has no logical bearing on the standard for implied malice murder liability under section 188.[8]

Since implied malice murder remains a viable theory (whether as a direct perpetrator or an aider and abettor), the question becomes whether the jury could have convicted Adams of second degree murder based on the now-invalidated natural and probable consequences theory. Did the instructions and verdicts permit a finding of murder under a theory that Adams aided and abetted an assault, the natural and probable consequence of which was dangerous to human life? Based on the record of conviction, the answer is quite clearly no.

Before Senate Bill No. 1437, if the prosecution intended to rely on a natural and probable consequences theory to impose murder liability, it needed to request a jury instruction specifying the target crimes a defendant might have aided or abetted. (*Prettyman, supra,* 14 Cal.4th at p. 254.) Such instructions were provided in *Gentile.* (*Gentile, supra,* 10 Cal.5th at pp. 840−841.) They were not, however, provided here. The jury was only instructed on two theories of murder—express and implied malice—and was not informed to find that Adams aided and abetted a target crime, the natural and probable consequences of which were dangerous to human life.

Absent a jury instruction on murder liability under the natural and probable consequences doctrine, the elimination of such murder liability

---

[8]     Adams suggests as a matter of policy that "[i]t makes no sense for those convicted of first degree murder to have a less onerous path to relief than those, like appellant, for whom the jury rejected the more serious homicide offense." Such arguments are better directed at the Legislature, but we find nothing incongruous about narrowing first degree felony murder liability, for which malice is not required, while leaving legal standards for implied malice intact.

offers Adams no basis for resentencing relief under section 1172.6. "In many instances, additional information from the record will establish that a defendant's conviction was not based on the natural and probable consequences doctrine, and that the jury must have convicted the defendant on the basis of his own malice aforethought. For example, *if the jury did not receive an instruction on the natural and probable consequences doctrine*, the jury could not have convicted the defendant on that basis, and the petition should be summarily denied." (*People v. Offley* (2020) 48 Cal.App.5th 588, 599, italics added; see *People v. Soto* (2020) 51 Cal.App.5th 1043, 1058−1059 [lack of instructions meant that defendant's second degree murder conviction was predicated on direct aiding and abetting and not natural and probable consequences liability].)

3.    *Adams was not convicted under any other theory of imputed malice.*

To this point, our analysis validates the trial court's reasoning. With the record of conviction establishing that Adams was not convicted of murder on a theory of felony murder or murder under the natural and probable consequences doctrine, Senate Bill No. 1437 does not afford him relief. After the court's June 2021 ruling, however, the Legislature enacted Senate Bill No. 775. That legislation ostensibly expanded the scope of resentencing relief to any person convicted of murder under any other theory "under which malice is imputed to a person based solely on that person's participation in a crime." (§ 1172.6, subd. (a); see *Vizcarra, supra,* 84 Cal.App.5th at p. 388 [through this added language, "Senate Bill 775 ostensibly broadened the pool of eligible petitioners"].)

Adams cites *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*) and argues an evidentiary hearing is required here because, as in *Langi*,

18

" 'the record of conviction does not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted "with knowledge of the danger to, and with conscious disregard for, human life . . . ." ' " (*Id.* at p. 984.) Adams notes that the jury in his case was given the same implied malice and aiding and abetting instructions that the *Langi* court believed could have supported a jury finding of imputed malice. (CALJIC Nos. 8.31, 3.01.) The People respond that Peterson's involuntary manslaughter conviction rules out any possibility that the jury convicted Adams of murder by imputing malice to him. As we explain, the People have the better argument.

*Langi* involved a recall petition filed by a defendant convicted of second degree murder for a group assault. Remus Langi and two confederates beat Miguel Martinez, who died from his injuries. Defendants' cases were severed for trial, and a jury convicted Langi of second degree murder. (*Langi, supra,* 73 Cal.App.5th at pp. 976−977.) Langi filed a section 1172.6 petition, which the trial court summarily denied given language in the opinion on direct appeal implying that Langi threw the fatal punch. (*Id.* at p. 977.) The Court of Appeal rejected this approach, stating it was not clear from the record who threw the fatal punch and noting the question was not germane on direct appeal. (*Id.* at p. 980.) The appellate court proceeded to consider whether Langi was entitled to an evidentiary hearing. (*Ibid.*)

Looking to the record of conviction, the *Langi* court reasoned that it did not conclusively negate the possibility that the jury found Langi guilty of murder by imputing the implied malice of the actual killer, without finding that Langi *personally* harbored malice. (*Langi, supra,* 73 Cal.App.5th at pp. 981−982.) Two instructions—both of which were also given here—were

19

central to the court's reasoning. CALJIC No. 8.31 instructed jurors that implied malice murder required a killing resulting from an intentional act that was foreseeably dangerous to life and was performed with knowledge and conscious disregard of that danger. CALJIC No. 3.01, in turn, provided general instructions on aiding and abetting liability. (*Langi,* at p. 981.) The court agreed with Langi that these instructions permitted the jury to find him guilty by looking to the actual killer's implied malice as to the murder and his (Langi's) conduct in aiding and abetting a different crime, without also having to find that he personally acted with malice in causing the death. (*Id.* at pp. 981–982.) As a result, the court reasoned, Langi could have been convicted of murder under some "other theory under which malice is imputed to a person based solely on that person's participation in a crime." (*Ibid.*; § 1172.6, subd. (a).)

Adams correctly notes in his opening brief that the instructions highlighted in *Langi* are the same as those at issue here. Similar to *Langi,* it was not clear who (as between Adams and Peterson) inflicted the fatal injury. Consequently, Adams suggests it was possible that the jury "found appellant's guilt to be based on a theory of imputed malice that is no longer allowed."

Assuming without deciding that *Langi*'s application of section 1172.6 is correct, there is one critical difference with that case. The defendants in *Langi* were tried separately. (*Langi, supra,* 73 Cal.App.5th at pp. 976–977.) Adams and Peterson were tried together, and the jury expressly found that Peterson *lacked* malice in convicting him of involuntary manslaughter. In making this finding, the jury was instructed under CALJIC No. 8.45 that involuntary manslaughter involves an unlawful killing "without malice aforethought and without an intent to kill." CALJIC No. 8.37 explained that

20

manslaughter generally "is the unlawful killing of a human being without malice aforethought." And CALJIC No. 8.50 clarified: "The distinction between murder [other than felony-murder] and manslaughter is that murder [other than felony-murder] requires malice while manslaughter does not."

As the People indicate, it was not possible on this record for the jury to have convicted Adams of murder by finding that he aided and abetted an assault resulting in death in which *Peterson* acted with implied malice. By acquitting Peterson of murder and convicting him of involuntary manslaughter, it is clear the jury did not find that Peterson acted with malice. Consequently, it did not convict Adams of murder by imputing Peterson's nonexistent malice to him. Whether Adams or Peterson inflicted the fatal injury, it is clear the jury convicted Adams of murder based solely on his *own* malice, given its rejection of first degree felony murder liability and the lack of instruction on the natural and probable consequences doctrine.

In sum, the record of conviction refutes the factual allegation in Adams's declaration that he could not presently be convicted of murder because of changes to sections 188 or 189. (§ 1172.6, subd. (a)(3).) Adams was convicted of second degree murder based on either express or implied malice. Both theories remain valid and unaffected by recent amendments. Moreover, Adams was convicted on a theory of malice based on *his own* actions and *his own* mens rea—and not the malice of any other person imputed to him. Accordingly, the trial court did not err in summarily denying Adams's section 1172.6 petition.[9]

_____

[9] Finding no error in summarily denying Adams's petition under section 1172.6, we likewise reject Adams's claim that the denial violated his due process rights.

## DISPOSITION

The judgment is affirmed.

DATO, J.

WE CONCUR:


McCONNELL, P. J.


O'ROURKE, J.